The final case is Peggy Hill v. Director of the Office of Workers' Compensation. Mr. Michalczyk, is that correct? Good morning. May it please the Court, my name is George Michalczyk. I'm here on behalf of Peggy Hill, the widow of Charles. It's the death certificate. I'm sure it's in there. I didn't see it. But is the death You referred to it on both sides. You referred to it in degrees. 183. Before I start, if I may, I'll reserve two minutes for a rebuttal. This is a black line case in which the administrative law judge committed a wrong on Peggy Hill by denying her survivor's benefits claim. Peggy Hill, the widow of Charles Hill, filed a claim four years ago and now are standing before the Court trying to decide why the judge committed error. Generally, he committed error for three reasons. He didn't rely on the substantial competent evidence. Secondly, he didn't apply the case law correctly. And thirdly, his decision is simply not rational. And I'll get into the specifics of it when I may. Other than that, you totally agree with him. Other than that, I agree that he conducted a hearing and listened to the evidence. This judge had basically two medical opinions to review. He had an opinion from Dr. Carey, who was a physician who treated, on two occasions, Mr. Hill shortly before he died. He had an opinion of Dr. Sherman, who the director hired to provide an opinion. He abused his discretion in accepting Dr. Sherman's opinion as probative and persuasive and rejecting Dr. Carey's opinion as not probative and not persuasive. Is there anything brought out on the record about the number of times? We see this a lot where the expert that the board calls in will be board certified in a lot of different things. And the person that the claimant brings in will not have a lot of academic kinds of things on the resume, but will have seen maybe 10,000 patients over the course of their career. Is there anything on the record here about the number of patients, particularly black lung patients or patients with compromised pulmonary systems based upon an occupational exposure that Dr. Carey had treated? First of all, the answer is yes. It's within his deposition testimony. Questions were posed as to the type of practice he had and the number of patients. I don't know the numbers exactly as they're standing here, but that was addressed. And second of all, just so it's clear, Mrs. Hill is not necessarily saying that Dr. Carey is a treating physician as it's defined by the act. I understand that. Let me address Dr. Sherman and what the administrative law judge did here. Dr. Sherman is one of those I'll call physicians who sits in his office and gets these cases to review, to be kind to him. And he has more credentials than Dr. Carey, paper credentials. But you'll see that Dr. Carey did have a practice in which he treated individuals with coal dust-induced pulmonary disease. Dr. Sherman then said, I don't know what caused Mr. Hill's death. The death certificate says cardiopulmonary arrest, which was very simply the heart stopped, the lungs stopped working. There are multiple factors listed there, including other disease factors, including pulmonary disease, chronic obstructive pulmonary disease. Dr. Sherman simply said, there are too many factors and I don't know what caused his death. Then he gets in another car and he drives down the same street in the opposite direction and says, but I know that pulmonary disease didn't. And I don't know how you can reconcile those two cars coming together. They just collide with each other. And that's what Dr. Sherman's opinion is. Well, Sherman doesn't really address the standard that we use, does it? The hastening, et cetera. I mean, he talked about there's no record that pneumococcius has contributed. He says that this alone is insufficient to support a finding that pneumococcius contributed significantly to the minor's death. Well, if he didn't testify as to what we consider to be the standard, I guess. That's another flaw in Dr. Sherman's opinion. We all know that the standard here is from the Lucas Savage case, which interprets 718-205C, that if pneumococcius hastens a minor's death, then that satisfies the survivor's burden of proof. I guess the other issue is the examination by the ALJ of the time immediately before death as being the relevant time period. Would you address that? I sure will, Your Honor. And, you know, being third on the list and last, you get to look around the courtroom a little bit. And if you look above you, you'll see all the lights that shine down here that light up this courtroom. And in the record, it's replete with documentation in the minor's hospitalization in July of 2004 by a treating physician at that time as well as consulting physicians at that time, that when the minor presented, he had abnormal breath sounds. There were decreased breath sounds. There were ronchi. There were, I think, crackles on occasion. And when Dr. Carey saw him for the last time less than 48 hours before his death, I think he died at 4 something in the morning on August 7th, less than 48 hours, he had decreased breath sounds and coarse ronchi. Those are all the lights that shine down that say during his lifetime leading up to his death, he had debilitating pulmonary problems. If you look to my right and Your Honor's left, above the lights, there's one light that's out. That's his less than 48 hours maybe prior to the time that he died. But that doesn't diminish the light that's shining down that says during his lifetime leading up to his death, he had ongoing pulmonary problems. And that's what Dr. Sherman and the administrative law judge seem to ignore. They want to take away, I mean, these lights are lighting up this courtroom and there's nothing you can do about the fact that the record shows that up until that less than 48 hours, he continued to have and continued to experience objectively pulmonary difficulties. Why the judge focused on those less than 48 hours, I don't know why, but I do know it's wrong. I guess that's what Sherman's opinion says. There are no records after 8504. So the circumstances immediately surrounding the death two days later are not known. And that goes with his opinion that he can't comment on the cause of death. That's why Dr. Sherman That's true of 99% of the people who die. There's no examination within 48 hours of the death. And they weren't just hit by a car. Right. This is something where it's hard. Your Honor, if the burden of proof was to have a doctor bedside at the time of death, I don't think there'd be very many cases awarded in these types of situations. How old is the survivor here, the widow? How old is she? And I ask because we have a history where we have talked about the delay that these cases encounter. And I don't know who will win. We haven't discussed this case, and we haven't yet to hear from Ms. Lindberg. And the case, I don't think, at least is as strong as you would suggest. So you may well lose. But I'm concerned about if you win the battle, you lose the war. If we remain this thing, for further review of the record, I'm just concerned that the survivor may not ever see anything if she ultimately were to win. I'm not sure how old she is, Your Honor. I apologize. I know that she's not in her 80s. Okay. And I don't think she's in her mid-70s. Okay. My mom is 92. So when you say not in your 80s, I don't know if you're talking about the north side or the south side. South side. Okay. I'm sorry. Right. For now. Well, let me ask hypothetically, though. On the question Judge McKee raised about, you know, a remand, you think this case, if it needs remand, needs remand for the findings or is the record sufficient to, you know, remand for the award of benefits? I think this case is foreordained. If you look at what Dr. Sherman said, there's nothing in his report that can support any type of finding that death was not due to pneumoconiosis as it's defined. It's not probative, it's not persuasive, and it's certainly not based on the objective evidencing record. If you look at Dr. Carey's opinion, it's the exact opposite. It's based on the totality of the evidence. I was told by the director in her brief or in his brief that I didn't understand the Mansia case, that I misapplied the Mansia case. I'm pretty familiar with the Mansia case for a lot of reasons, okay? I know you're familiar, Judge McKee, with the Mansia case. Did you argue that case? I did not argue it, but circumstances prevented me from having my name on that case. In Mansia, the judge was criticized because he focused on a 27-word paragraph and ignored the totality of the evidence. That's exactly what happened here. The judge ignored the totality of the evidence to focus on that one period just before the minor died when, unfortunately, he was in the nursing home and there's no really documented record. What we have is documentation from July of 2004 when he was hospitalized with at least four different doctors saying he had ongoing pulmonary problems, and we have Dr. Carey, who, by the way, in answer to a question from the director at his deposition, and I forget the medical phrase, hyperneutremia, something like that, associated with the minor's malnutrition and malnourishment, specifically even stated to that that that was indicative or coincidental with an ongoing pulmonary problem. There's nothing in this record that suggests anything but ongoing pulmonary problems prior to the minor's death. There's nothing in this record from Dr. Sherman that says otherwise, and there's nothing in this record that contradicts basically what Dr. Carey has said, and that's that. One other thing in Mancia, and that issue obviously got to me. In Mancia, the treating doctor said in answer to a question, someone like Mr. Mancia, and that was another criticism that the judge had in this case because he said that Dr. Carey argued in generalities, and if you look at, again, the totality of the question that led up did, do you have an opinion as to the cause of death or whether pneumoconius has contributed to Mr. Hill's death, and the doctor said yes, and then I asked him to explain, and he explained, and because he didn't use a proper pronoun like Mr. Hill's death instead he used someone, but then later on said someone like Mr. Hill. Well, that was the question, wasn't it? He was asked the question, as I interpret this, he was not asked specifically about Mr. Hill. He was asked specifically someone in Mr. Hill's situation, someone with these medical records. He was asked what caused Mr. Hill's death or did pneumoconiosis play a role, and then he was asked to explain, and the judge says, well, because he used a general pronoun, someone, that he was talking about the universe and not just Mr. Hill, but yet if you look at Mancia, Dr. Manganiello in that case talked about someone and then kept referring to Mr. Mancia in that case. Now, there was a stipulation here about as to the existence of pneumoconiosis and the relationship between monoclonal and the disease. That was stipulated, correct? That was stipulated, too. Thank you. Can you save some time, I think, for a couple of minutes? Okay. Ms. Lindberg? Did I say that correctly? It was a G in there that I didn't remember my pronunciation. We've been boring you all morning. You were yawning during the SEC case, and now you know how we feel, but we can't yawn. I thought we were scheduled to go first. Okay. We're ready to go. We tell everybody that just so they get it. Oh, really? Keep them on their toes. Right. Well, good morning. May it please the Court, my name is Kristen Lindberg, and I am here on behalf of the Director of the Office of Workers' Compensation Programs at the Department of Labor. Walking through this case, what just jumps out at me, jumps down on me, actually, and sits on me is a statement that there is no evidence, I mean, no evidence. That's the statement that Dr. Sherman used. No evidence that the death was caused by black lung or that black lung contributed significantly. He had x-rays that showed that his lungs are compromised. There's testimony, which you may not have known about, but the ALJ should have known about, from the wife about his breathing problems. He had a productive cough. His breathing was so compromised he couldn't sleep at night. He had, I won't even try to pronounce it, but he had COPD. In fact, the death certificate suggests he died of COPD. There's evidence in terms of renal failure, one of the causes of death. There's evidence from Dr. Carey that if you have a compromised pulmonary system, that makes everything worse because the organs can't get the oxygen that they need. On the death certificate also, cardiopulmonary arrest, along with COPD, respiratory arrest, renal failure, with evidence that that could be brought on by the compromised lungs, and then the doctor says there is, and then there's a stipulation that he had black lung and that the black lung was caused by his nine and a half, four years of working in the mines. And then you see the ALJ and the experts saying that there is no evidence. I mean, I was just knocked over when I read that. How could that possibly be? Doesn't that suggest, or let's answer that in a second. We haven't conferenced this case yet, but I read that, a statement which is so inconsistent with the evidence. No matter how you interpret the evidence, it's there. The only thing that I can think of is that this hearing was all about finding a way to deny this person her benefits. That's the only way that I can explain a statement like no evidence that the death was caused by black lung or that black lung contributed to it. Our problem with this case is that the standard of proof is not that claimant has to show that Mr. Hill had pneumoconiosis before his death. That's been established. We've conceded that. The issue here is that he needs to prove that... I'm not sure Dr. Sherman submitted, but go ahead. ...that claimant needs to prove that pneumoconiosis was a factor in his death, hastened his death in some way. The findings during Mr. Hill's hospital stay indicate ongoing lung disease. And if we were to accept that findings of ongoing lung disease are enough to prove that death was hastened by pneumoconiosis, then every minor who is adjudged to have pneumoconiosis during his lifetime and receive benefits would then be adjudged to have died from the pneumoconiosis. But if the death certificate has two of the four causes relating to the lungs, and if you have an opinion of someone who has actually treated this person, whether he's treated, you know, classic under the act, but has seen the person... Listened to his lungs. ...and listened to his lungs, and you also have lay testimony, you have evidence. I guess the issue is how is Sherman's opinion supportable? First of all, the lay testimony in this case, I believe the claimant's brief was a little misleading, was only to the fact that the minor had difficulty breathing during the 38 years that she was married to him. The cough and trouble sleeping. The cough and trouble sleeping, and that these were his symptoms over a very long period of time. This is not lay testimony like in Subic, where the survivor testified that the minor went into the hospital, specifically in respiratory arrest, and was put into an oxygen tent there. Well, if the evidence suggests that he had a productive cough, trouble going up and down the steps, trouble breathing for 30 years of his life, should we conclude that the day that he went into the hospital he got better? Or should we assume that he went to the hospital with his lungs in the same condition they had been in for the past 30 years? I think you can assume that, Your Honor. We're not stating that he all of a sudden got rid of all his respiratory symptoms. And as you'll note from the ALJ's opinion and in the medical records, there were very mixed pulmonary findings in the hospital. Some of the doctors- I'll be very careful with that. There were times when his lungs were clear. To me, there's no doubt that his lungs were compromised. I can't remember the technical terms, but I spent some time trying to figure out what they meant. Basically, that his air sacs were severely compromised. A number of them had been blocked and were no longer functioning. So he could have lungs that were very, very clear, but if only 40 percent or 50 percent, whatever capacity he had remaining, if that's the only amount of lung capacity that he had operating, the fact that they were clear at the time doesn't suggest that the black lung was not seriously compromising this person's whole system. And all the medical records said, the most positive one that the ALJ seized on and that Dr. Sherman seized on was that his lungs were clear. That's clearly not debated. They were clear, but if only 10 percent of the lung was functioning because the rest of it was blocked, but he had no mucus or accumulation of fluids in the 10 percent that wasn't blocked. But that's one of the things we don't know, and what Dr. Carey specifically didn't address was what kind of lung function did he have. I mean, we have a record from December of 2003 that describes the minor's pulmonary disease as being mild. So Dr. Carey doesn't address how much pulmonary function he had, how much trouble this minor was having with his breathing, and in fact the minor himself in the hospital denied having trouble with his breathing. He denied coughing. So I don't think we can just speculate, and the point here is that the claimant had her burden of proof to demonstrate by preponderance of the evidence that these lung issues did hasten his death in a tangible way, and what the director is saying is that that is not present there in Dr. Carey's report. But Carey ties the renal failure to the pulmonary condition as well, and so you have of the four causes, three and a half, cardiopulmonary arrest, respiratory arrest, renal failure, COPD, and then you have Sherman saying death appears to be related to a general level of severe impairment from dementia and malnutrition and possibly due to his heart disease. Right, and there were, I mean, the minor went into the hospital for weakness and confusion, not for pulmonary symptoms. But we don't have a the major factor was. Our standard is different. What about his testimony deposition? You know, Dr. Carey says this, right? The question is, did his lung disease play any factor in or contribute to his death? And he says yes. Then he goes on to explain how it contributed to his death. Isn't that? Well, we don't think he really did contribute, explain how it contributed to his death. That's what he said. Well, the lung disease is going to contribute to all of the other things on the death certificate. His respiratory arrest, his renal failure is going to be attributed partly to his lung disease. His arterial sclerotic cardiovascular disease is going to be affected by his lung disease and so forth. He says all of these were contributed to by, you know, his problems with his lungs. But he doesn't link those things. He doesn't give us any evidence from the record, and he had all this medical evidence to look at to show us that, in fact, with this particular minor, his renal failure was linked to his lung disease. He didn't use the first-person pronoun. He used third-person pronouns generally. Right. And that's the kind of standard we want to use to deny someone recovery. And some of this is common sense. Clearly, we're not physicians. But we, I think, all have enough high school biology, maybe even junior high biology, to know that all of our organs need oxygen. You don't have to have a board-certified degree in any kind of fancy specialties to know that if any organ doesn't get oxygen, that organ is going to have a problem, and the person with that organ, whose body that organ is in, is going to have a problem. It's clear, and Dr. Shuren says, that given his, that's what Dr. Carey says, given this minor's history of his lungs being compromised, things like his kidneys are going to have a problem. His heart is going to have a problem. Well, it doesn't differ. He's got renal failure, respiratory arrest, cardiopulmonary arrest. It seems to me all this record can be explained by the fact that this guy had trouble getting enough oxygen into his body to have his organs function properly. That's all Carey said. He said it using a lot bigger words than I'm saying. Right. How do we justify that with another doctor coming in and saying, yeah, there's no evidence here that his being, his pulmonary problems hastened or contributed to his death? How do we square that? Dr. Shuren points to the fact that there is no evidence in the record of respiratory failure, dyspnea, which I guess is trouble breathing. There wouldn't be evidence of respiratory failure. He wouldn't do that until he died. But there is evidence that he had the kind of respiratory compromise that could cause respiratory failure, though, isn't there? And then the death certificate, which I'm assuming was admitted into evidence, it says cardiopulmonary arrest, respiratory failure. So to the extent the death certificate is evidence, and I assume that's the way I was admitted, there is some evidence. Now, you can reject that evidence, but it's not fair to say that there's no evidence that the man died of respiratory problems. First of all, the death certificate, its value is compromised because no one was there when he died. So to an extent, it's a hypothesis that no one was there. Wait a minute. Let me think. Run that one by me slowly because sometimes my mind doesn't absorb things it's not expecting to hear. Are you saying that the death certificate we have to be a bit careful of because no one was there when he died? Right, and there's evidence that on many death certificates, the cause of death is written down as cardiopulmonary arrest because all that means is your heart stops and your lungs stop working. So everyone who dies, they die of cardiopulmonary arrest. So then we look at the next three, which are totally related. They were conditions that the minor had a history of suffering from. But for a physician who saw this patient once, maybe twice, and didn't in fact indicate anything more than perhaps one symptom of ongoing lung disease, which was the decreased breath sounds, Dr. Carey noted when he arrived at the nursing home that he needed to consult with dermatology and that he needed to get control of the patient's pain. Dr. Carey didn't say anything that I can tell in his notes about the minor's pulmonary problems and treatment of those problems. And in fact, he noted, I believe, I'm not a handwriting expert, but it appears that Dr. Carey actually noted that there were crackles in the minor's lungs, not coarse ronchi as he testified. And those crackles, as Dr. Carey testified, were indications of congestive heart failure, not of a pulmonary issue. See, that's my problem, because the record we established, and we've had enough of these cases so that our modicum of expertise can be brought to bear on this. When you say that's evidence of heart failure and not pulmonary disease, you cannot separate the two, and there's evidence on this record to establish that. You can't separate the two. You can't separate the heart problem from the thing that may well have caused it. The person's pulmonary system being so compromised, the heart can't get enough oxygen, has to work harder and harder, and you run into a problem with a heart attack or whatever. That's basically what Carey said. If you shut down the lungs, the other organs are going to have a problem, the heart has to work harder to push the blood through, I think that's the way he phrased it, then it's not going to get the oxygen it needs to do that. And you're saying, I think this is what the ALJ did, that, well, we've got the heart problem over here, that's not black lung, and so therefore we're not going to focus on his pulmonary problem that showed up on the X-ray because we're really looking at only his heart complication. What I'm worried about here is that, from what I'm hearing, we may come to the conclusion that every minor who is a judge to be disabled from lung disease in his lifetime will then be a judge to be eligible for survivor's benefits after he dies because the conclusion here is that every minor who has lung disease... The doctor said his pulmonary, you know, compromised lung contributed to his death. Here we have a problem where it seems like in the agency proceedings, Mansia was not followed, that the standard that was used was hasten means immediate, and if we can't find the immediate reason why he actually died that moment, then we can't say it hastened, whereas in Mansia, and I think our case law is, hasten is a... If I didn't have this, I would have lived till 80, and I died when I was 62 because it so compromised my ability to live that I died. I mean, it seems like, at the very least, we would need to send this back and say, yo, hasten doesn't mean two days before what was going on. Hasten is global, it is contributory, it's not... I mean, it almost seems like the agency, the ALJ is looking at hasten as a narrower standard. It's almost like it's the ALJ's money. Whereas we view it as a broader standard that significantly contributed. So, I mean, at the very least... I mean, don't you think that's a problem in what Sherman has opined here? That his first conclusion is, you know, I really don't know what happened immediately surrounding his death, you know, number one. Number two, he was felt to be stable on the day of admission. His whole conclusion has to do with the little window of time before his breath actually stopped. Is that a problem? My time is up. Do you want me to answer? I will answer. I don't think that Sherman actually focused on those two days as much as the claimant argues that he did. Sherman made an honest assessment. I mean, it's not immediately clear what caused the minor's death because we're not sure what problems he was having immediately preceding his death. I mean, that's an honest assessment. But he doesn't say whether the pneumoconiosis hastened his death in a broader scheme of things as compared to the last moments. In that he said it needed to be a substantial contributor to death? No, he said the cause of death isn't clear from the record. The circumstances immediately surrounding his death are not known. He's focusing on... Right, and then he went on to say that the minor's death was likely caused by a severe impairment, which is evident from the record. The minor was malnourished. He was dehydrated. He had to have a feeding tube put in place. Indeed, he was felt to be stable on the day of admission. Right, which is in the records. Right, but he's still looking at that little window. But he also looked at the minor's hospital records. I mean, he evaluated those hospital records. And where does he come from the x-rays and what the x-rays showed? And then how come he looked at the x-rays and concluded there's no evidence that the death was caused by black lung? He saw that there was no evidence of acute respiratory distress or dyspnea, which would indicate that the minor was having particular trouble breathing. And that was the reason for his conclusion, that he saw no evidence that this pulmonary impairment did hasten his death. And I think that's, I mean, it's not inconsistent to say the cause of death is unclear, but I can rule out these one or two possible causes of death. And given his qualifications in both pulmonary medicine and critical care medicine, I think his opinion is especially noteworthy, given that this is a man with very complicated medical problems. I mean, complicated in multiple medical problems and a complicated medical history. I think that hurts you, because the more complicated his medical problems, the more likely that the decreased oxygen flow to his blood is going to really put him in some jeopardy. And it doesn't seem like Dr. Sherman, with all his highfalutin credentials, paid any attention to that fact that most practitioners who put stethoscopes on chest and ask their patients to cough could have told them. Well, then we would wonder why Dr. Carey didn't point to any studies that actually show that this minor's oxygen levels were compromised. He just kind of posits that there's low oxygen throughout his system that might be causing these other problems. But there's no evidence in Dr. Carey's report that his oxygen levels were compromised. And given the findings in December 2003 that he had mild COPD, maybe there wasn't that much compromise. We just don't know. Is that on the record? There are laboratory tests on the record. I don't know if blood gas CO2 is in there. I don't know if there are oxygen levels in there, to be honest. Okay, thanks. Thank you. Thank you. Thank you. For clarification purposes, Mrs. Hill will be 65 in September of this year. This is a case where I hear the director saying that, well, gosh, if all that we have to do is say that a minor had a diagnosis of a pulmonary condition during his lifetime and was awarded benefits during his lifetime, then there's nothing else that the widow has to do. Maybe she should just roll over and pay all claims. That's their fear. That's not what the law is, and we all know that's not what the law is. Their fear should have a flip side, that if the director's position is taken, then it's almost as if you have to have a physician bedside, a physician who's as equally qualified as Dr. Sherman or Dr. Kander or whatever other doctor they utilize in pulmonary and critical care medicine to comment on exactly what was going on at the time that the minor took his last breath. And that's not the burden that the survivor has, and I certainly hope it never becomes the burden that a survivor has to have to establish that. Let me ask a question. There are a lot of lab reports and consultation records, and there are some statements here. There's lung clear to auscultation at 124, 128, chest clear to percussion and auscultation, but it's hard to tell, and there's loads of medical problems here. Is there anything you would point us to specifically that would be the medical pinpoint to the fact that this was not just one of his conditions but one of the ones that hastened his death? Well, what you can look at is the fact that at 179, 180, 181, I believe, are consultations where they have physical examination findings that the lungs had abnormal breath sounds. And you can look, I believe, at the record at 118 and 120, and I hope I'm right, but there are x-rays where Judge McKee referred to the closing of the sacs. There's x-ray evidence of atelectasis, which is a pulmonary problem that you see on the lungs, which Dr. Carey also addressed as evidence of decreased breathing capacity. And I just want to clarify, my time is up, but just very quickly, this is not a case like Lango where a judge looked at the medical report of a physician who basically offered a conclusion, no reasoning, and no records. This is the exact opposite. This is the case where there is a conclusion supported by reasoning and supported by the evidence in the file. Thank you. Thank you. And I want to thank both counsel for helping us out with helpful argument. I'll take that under advisement.